The first case for argument this morning is 20-2334, Cornell Research v. Vidal. Ms. Goldenberg, whenever you're ready. Good morning. Good morning. Thank you, Your Honor, and may it please the Court. This case relates to the solution of a major thermostability problem in the agricultural food pellet industry and the cancellation of six groundbreaking patents. There are three main issues in this appeal. The first issue involves annotation, and the record demonstrates that Dr. Lee's testimony is sufficiently corroborated by both his contemporaneous manuscript and by circumstantial evidence, including expert testimony. The Board's contrary finding is not supported by substantial evidence. Further, at minimum, Dr. Lee conceived of at least as much as Kretz prior to Kretz's priority date, which is all that is required for annotation. Do I understand right that we do not have to reach the whole Kretz issue if we agree with the Board on the rest? If you agree on the other combinations, that would be correct. The Kretz issue only relates to the 300 patents. But turning to that second issue, which involves motivation to combine, mostly references that were already considered by the Patent Office, the record demonstrates an unpredictable art at the time of the invention. In view of such uncertainty, a skilled artisan would have had no reasonable expectation of success in combining various disclosures from Dasa and Greener with either Chang or Romanos and Van Gorka. I understand what you're going to say, and we read it all in the brief. The concern I have for this, so I don't know if you have a response, which is that whether you're right or wrong, this is clearly substantial evidence applies here, right? And there was conflicting testimony by the experts. And there's detailed discussion by the Board explaining which expert they credited and why. How do you get around that on the field? Certainly, substantial evidence isn't a mere scintilla. It has to be adequate for a reasonable mind to accept. And if you look at the evidence here, it simply is not adequate. Specifically, all the experts agree that it was an unpredictable field, and they admitted that whether any given bacterial phytase could successfully be expressed in a fungal host was a case-by-case basis. This is also shown by ABF's own expert, Dr. Robertson. In 2004, he made a statement that thermal tolerance was not necessarily predictable based on a sequence or structure analysis. Of course, Cornell's expert also agreed, Dr. Benedict. And then you have the testimony from Dr. Hahn, who was a researcher. Why is that not substantial evidence? It seems to me you're arguing more of the weight of the evidence than whether it's substantial evidence or not. It's because everybody's in agreement of this evidence, which is we've got an unpredictable field. Once again, it has to be adequate for a reasonable mind. And here, that simply isn't true. You look at all of the evidence here, and you're only left, even after crediting the testimony of ABF's expert, the record, at most, shows that while Pechia's yields can be high, we learned that E. coli's phytase yields are low. And that teaches away from the motivation to combine. That's from the prior Wodzinski reference. And there's no correlation between a higher yield of Pechia and a cheaper production, the economics, which is what the board relied on. If you look at the evidence behind what the board relied on, it was testimony from Dr. Robertson that Pechia had high yields, and that would provide an economic incentive to combine. But there's also testimony that high yields require more culture supernatant, which is expensive. And there's no record evidence here showing which outweighs which one. Are you really saving money here? And that testimony about culture supernatant went unrebutted. KSR clearly teaches us that it doesn't have to be the best choice. It just has to be in the range of acceptable choices. So to judge Raina's point about the weight, I mean, certain weight was ascribed to certain of the testimony. And you mentioned it was clear that this was an unpredictable field. Well, that's not enough. The board analyzed, I mean, Robertson said what he said. The other experts said. And they credited certain portions of his testimony over the others. And you also mentioned the Wyszynski teaching away. Well, if one reference teaches away, that's not dispositive of the issue. The board understood what Wyszynski said and considered that and weighed it as it thought it should. And that's a substantial evidence review. I grant you it's more than a scintilla, but substantial evidence based on a record that's very fact-based and based on testimony of experts is a really hard thing to overcome. I recognize it is a difficult standard to overcome, but I think in this case it is met. And if you look at it, you mentioned the choices that were available. There is no record evidence indicating that there were only a few limited choices of phytase and host. In fact, it's the opposite. If you look at appendix page 15-206, you'll see testimony from Dr. Robertson explaining that there were over 10,000 E. coli enzymes alone available to choose from. And if you look at the director's brief on page 40, the director says, Greener discusses just two phytases from E. coli. Dasa narrows that down to just the APA gene. Chang discloses a few examples of well-characterized industrial microbial production hosts. That's cherry-picking. That's using the patent as a road map and using hindsight bias to build a story of how you could build this invention based on picking and choosing things from the prior art. And we know under KSR and this Court's jurisprudence that that is insufficient. Can I move you back to where you started, which is the Kretz issue? And I think I heard you say here argue substantial evidence with respect to the boy's determination. And I thought in your brief you were trying to make more of a legal argument than a substantial evidence argument. Yeah. I don't think I said substantial evidence with respect to Kretz. And if I did, I apologize. It was a slip of the tongue. So whether or not a reference is annotated as a question of law, there are underlying factual findings with that. And then the other standard that's involved here is the rule of reason standard for corroboration, which is a standard that this Court developed over the years to ease the requirements of corroboration. So we have three standards at play when looking at Kretz. And a lot of things are certainly disputed with regards to Kretz, but much is not. It is undisputed from this Court's jurisprudence that a few species can cover an entire genus. It is undisputed that Dr. Lee testified that he envisioned the genus. It is undisputed that corroboration only requires this easier-to-meet rule of reason standard. So let's look at what was the corroboration evidence here. You've got the April 16, 1997 manuscript, which is contemporaneous, and it's where Dr. Lee recognized that because it is a eukaryote, Pichia has many of the advantages of higher eukaryotic expression systems. You've got Dr. Robertson's own testimony that a skilled artisan at that time would have understood that successful expression in a yeast species would indicate successful expression in the broader genus. You've got Dr. Benedict, who's Cornell's expert, also agreeing with that. And then you have Kretz, which is a very interesting contemporaneous reference that was written to a skilled artisan and assumes that fingal cells such as yeast can produce this E. coli fitase. Now Kretz doesn't tell you how to do it. Kretz doesn't say it did it. But Kretz clearly thinks that it's within the mind of a skilled artisan that this could be done once you accomplish certain things, which work Dr. Lee did accomplish. Further, the only thing to meet the corroboration standard, or to annotate the reference that Cornell needs to show, is that Dr. Lee disclosed at least as much as Kretz, not actually the whole breadth of the claim. The whole breadth of the claim we can talk about in enablement, written description, that's a different challenge. But here, all we have to do is be Kretz. And all Kretz did is said one line. It's a reference to fingal cells, with a typo, meaning fungal cells, such as a yeast, as an example of an appropriate host. So all that Cornell was required to show to meet its corroboration under this rule of reason standard was that Dr. Lee disclosed expression in fungal cells such as yeast. Well, he clearly did that. He did that in two different species. If we find that Kretz was prior to the 300 patent, does that anticipate or render obvious all the claims of the patent? So it's just for the 300 patent, and it was an obviousness. I believe it was an obviousness argument there. But the court considered Kretz. But if that's annotated, the combinations that include Kretz would go out. In other words, so the answer is yes to him? Yes, for the 300 patent. Now, there's five other patents that didn't involve Kretz, so the only issue for them is the motivation to combine on the other combinations. So the last issue in this appeal relates to thermostability of the claims 10 through 12 and 21 through 23. And there's a waiver issue involved in that. Yeah, but that's pretty baseless in our opinion. The waiver issue seems to be based on the fact that in the motivation to combine section, we say all of these arguments apply to the combinations with Olson, too. That statement is limited in the motivation to combine section. The thermostability section, if you look at our table of contents, is a separate section. It's combination agnostic. It's making arguments based on any combination that the board's findings related to thermostability are not supported. And so the waiver argument doesn't really make sense to me. I think the director just misread our brief on that issue. Well, as I understood it, the argument is you're only arguing inherency. Yes. And the board relied as an alternative, I guess, on Olson, and you never attacked that or rebutted that or argued that. Is that the way you're understanding what the argument is? Well, it's that these arguments apply equally to Olson, just as they do every other combination. Because these arguments, like I said, are not directed to any particular reference. It's simply a lack of proof argument. If you look at the record, there's no data or analysis of the experts other than the quotations that the board cited relate to the actual invention, not any combination. No expert said you take Olson and you'll get these thermostability ranges. And the board didn't rely on that. And, of course, you can only affirm based on what the board relied on under SEC versus Chenery. So the board only relied on expert testimony about the invention, and there's insufficient evidence here on the record to show that these specific combinations would result. You take these combinations, not the invention, but these combinations that you're cherry-picking, and you'd result in the actual thermostability ranges.  There's no analysis. There's just statements about the invention. So there's a mismatch there in the evidence. And if you compare this case to Hasbiro, which is the court's preeminent case on inherency. I thought your argument with respect to the thermostability is that the board's finding isn't supported by substantial evidence because it doesn't disclose the specific claim temperatures. Correct. None of the combinations do. Does it have to disclose the specific range temperature, or can it just disclose an increase in the temperature and thereby meet the thermostability claim? So an increase in the temperature in your hypothetical would not be sufficient. You have to actually disclose. In an inherency inquiry. Yeah, you would have to show that the result of combining these references would inherently have this feature. Okay, and it appears to me that the evidence shows that. But I thought your argument was that there's no disclosure in the evidence as to a specific claim temperature. Exactly. So you'd have to show that this specific claimed temperature, that's the feature I was talking about, is the temperature. Because that's what's in the claims. So for inherency purposes, it's not enough to show just a rise in the temperature? Correct. Because that's not what the claims say. The claims have a specific range. So you have to meet the range. And if you can't show, and here there's just a failure of proof on the evidence, if the evidence doesn't show that you're going to hit that range, they don't have expert testimony saying that. They have expert testimony on the invention. And then the only other evidence that they relied on was an unsupported examiner statement that the thermostability of the phytase would be an inherent characteristic of a phytase expressed in the yeast host cells. But he cited nothing and then withdrew that rejection. And then a statement from the applicant during prosecution history about similar properties. But we know from this court's jurisprudence that similar does not get us to inherency. Go ahead. No, you're into your rebuttal. So finish your statement and maybe you want to sit down. Yes. The last thing I was just going to note is that we're not in an inherency and an anticipation analysis. We're in an inherency and an obviousness analysis, which is a higher standard. And the board found no inherency with anticipation, but, yes, with obviousness, which just further underlies the sort of confusing way that the board treated this issue. I'll reserve the rest of my time for rebuttal. Thank you. Good morning. Good morning. Your Honors, and may it please the court. I'll start with obviousness because that will dispose of all of the claims and the six patents in this consolidated appeal. With respect to obviousness, there's substantial evidence support for the board's finding of a motivation to combine with a reasonable expectation of the success of expressing the E. coli apafytase from Grenier and DASA in either the fungal host of Chang or Romanos and Van Gorkum. With respect to Cornell's arguments that the experts agree upon unpredictability, that there's this wildly unpredictable field, we respectfully dispute that. And as your Honors recognized, the board weighed the credibility of both experts and found that Dr. Robertson's testimony that there was a motivation to express this was credible. And with respect to the specific deposition testimony that counsel pointed out with respect to Dr. Robertson, he did not testify that you wouldn't expect bacterial phytase enzyme to work. He said you wouldn't expect all bacterial enzymes to work. And that's the 10,000 number that counsel represented. And that's at appendix 15-206. If you continue on and read his deposition testimony at 15-207, in addition to saying he would expect that bacterial phytases would work, he gives you a reason why. And that's because they have this co-factor in them that explain why he would expect the bacterial phytase to work when perhaps you wouldn't expect all bacterial enzymes, you know, all 10,000 of them, any coli to work. And that's at 15-207. But he also explains that in his appendix, or his second declaration at appendix 58-55. With respect to... Enzymes that are different from phytase that were the subject of the testimony you're just describing? So he doesn't list them. Stuff to get phosphorous out or stuff to get something else out? Basically, I think the best analogy would be to think of a human. And we have tons of enzymes. Now, obviously, a bacteria itself has many fewer enzymes, but there's still 10,000 that do a whole host of things to break down all different sort of things. Dr. Robertson did not go through all of the different various types of bacterial enzymes that are in E. coli. But I think a good analogy is just as we ourselves have thousands of different types of enzymes that do different things and make different proteins that we need to survive, so a bacteria does. This particular type of phytase in E. coli, there's a number of different ones. And, Dr., you know, you can screen to find out which type of bacteria, which type of E. coli has different types of phytase. So Kretz talks about the E. coli B phytase. There's also, as we know from Grenier and Dasa, the E. coli App A phytases. Those are just different types of phytase that do, as Your Honor recognized. What was the appendix page for this testimony that you're discussing? For the testimony about B, well, I'll put your honors to the board decision where the board, in talking about the obviousness of the phytases in view of Kretz, and that is, I apologize. You don't actually have the appendix page for the testimony. Your Honor, I do not have that at hand, just because that wasn't at issue in this court. So I do not have it, but I'm happy to supplement later if that's necessary. That's okay. I can find it. Okay. With respect to counsel's discussion of the Wodzinski reference and teaching away, first I'd like to point out that the reply brief counsel argues, Cornell argues in the reply brief at 18 and 20, that Wodzinski teaches away from using hosts, that bacterial hosts or fungal hosts. That's simply not correct. Throughout the course of this proceeding, the entire focus on is whether Wodzinski teaches away from using bacterial phytases. That's the thing you put in the host. And so with respect to whether Wodzinski teaches away from bacterial phytases, the board looked, as they're supposed to do, at all of the statements in the art and the expert statements, and found that when they looked at Dr. Robertson's testimony, that was not negated by Wodzinski's statement. At appendix 84, the board said they looked at Dr. Robertson's testimony and decided whether or not it was still credible with the fact that he said Wodzinski itself does talk about some negative things about bacterial phytases. But the citations to their testimony that they have there say that, go on to reflect that Dr. Robertson explained that despite Wodzinski's statement, one of Ordinary School in the Art would still have motivation because Wodzinski was, A, wrong about the pH of a bacterial phytase. He said it would be neutral to alkaline. And in fact, as Vernier says, it's a pH of 2.5, which is highly acidic. And also that one of Ordinary School in the Art would know how to design around Wodzinski's problems. And so the board looked at it all together in totality and found that Wodzinski did not destroy the credibility of Dr. Robertson's statement that one of Ordinary School in the Art would be motivated to express a bacterial phytase. Notably, we don't have Wodzinski in the record. So that's an initial problem in finding that Wodzinski teaches away. The whole discussion before the board was whether or not Wodzinski causes a problem with the credibility of Dr. Robertson. So we have Dr. Robertson's deposition testimony and some prosecution statements. The board looked at all that and made a credibility determination based on that. With respect to counsel's discussion of an allegedly not rebutted economic argument, I'd like to point out that the board at Appendix 81 specifically credits Dr. Robertson on his experience with costs of production, specifically addresses the arguments of Dr. Benedict that Cornell relies on. They addressed Paragraph 73 on this Appendix 81, and they find that Dr. Robertson was more credible. That his discussion at Appendix 5847 rebuts Dr. Benedict over whether E. coli is more cost-efficient. Just a few more points with respect to the— Can you just address Ms. Goldenberg's point about your sentences or sentence on page 40 of your brief that this kind of— I think she used the word cherry-picking of going from Greiner to Dossett to Chang, as I take it, kind of infected by hindsight use of the patent itself. Yes, Your Honor. So this is with respect to the finite number of predictable solutions. And as we pointed out in our brief at page 40, Chang only discloses a few examples of well-characterized industrial microbial production hosts. And Dr. Robertson has a detailed discussion of that at Appendix 5904. So it's not the board doing a cherry-picking. It's that Dr. Robertson looked at the art and said, if I'm going to take Greiner, who says, I have this appe finites, I need to express it. I'm going to look to see where can I express it. And Chang tells me, I have a few well-recognized industrial production hosts. That is sufficient to narrow down the number of hosts that we're looking at. Now, when counsel mentioned that there's 10,000 out there, or in the reply brief, they talk about a million hosts out there, those are different considerations. With respect to the 10,000, as I already mentioned, that was discussion of how many E. coli enzymes are out there, not how many phytases or how many phytases were disclosed as having benefits. Like Greiner tells you that E. coli appe finites has these benefits. It is known for the feed industry. So we're also narrowing it down by the feed industry. Greiner talks about the feed industry. Chang talks about the feed industry. Then you have Chang telling you, this is an off-the-shelf kit. Romanos repeats that as well. You can buy this Pecia from Invitrogen and use it. I'm going to tell you exactly how to do that. That is not telling the one of ordinary skill in the air, just figure it out, go out there in an art that's completely unpredictable, and I'm not giving you any guidance. It's saying, here's the host, here's where you can buy it, here's exactly how to use it. With respect to the millions of hosts that they discuss in the reply brief, I think it's important to distinguish between what we're looking at in obviousness, which is how many hosts were out there in the art to choose from, versus what they're trying to claim in the broad scope of their claim with respect to all fungal hosts. So there's a difference. One would not have considered all fungal hosts, because all fungal hosts weren't known in the art at the time to be used as industrial bacterial production hosts. That's a different question. That's the scope, the extremely broad scope of the claim that they're trying to get in the 300 patent, that is this one million number of fungal hosts out there. Finally, with respect to obviousness and thermostability, your honors, we would say it's pretty clear, if you look at the opening brief at 44 to 48, despite counsel saying that they've discussed the Olson reference or they've argued the merits of the Olson reference, it simply does not mention Olson. It doesn't mention any of the arguments or citations of the board's discussion of why Olson found these thermostability arguments, or why one would have been motivated to get these thermostability limitations with a reasonable expectation of success based on Olson. It only talks about inherency. So for that reason, they've waived any arguments. But what about the challenge to the sufficiency of the board's inherency finding? Put aside Olson. Certainly. So if this board forgives the waiver, we'd also argue that Olson by itself stands, and that's discussed at Appendix 140 and then 93 to 100, which does not rely on inherency. That is a separate argument from inherency. The board found, based on Olson... Right. I'm sorry. I was asking, but put aside Olson, why was the board's inherency without Olson finding sufficiently supported for the pretty high inherency standard? Yes. So with respect to the support, both experts agreed thermostability is the inherent result of expressing the same enzyme in the same phytase. So you have Dr. Robertson saying that at Appendix 5820, then you have Dr. Benedict saying that at Appendix 7695. That alone is enough to support the fact that when you have the same enzyme, ApA, and the same phytase, fecia, you will get the same thermostability results. That is ample, we'd say, substantial evidence support. Would I be thinking about this wrong if I asked the question, aren't there other variables that go into exactly how you express the same phytase and the same host that could actually change the thermostability properties of what comes out? Your Honor, I'd say that could have been an argument that Cornell could have made, but the point is that neither expert said that. They said, yes, it is inherent. The examiner also said that. It is inherent when you express this ApA phytase in this production host. I agree that in this art, it seems like it may be likely, but that does not seem to be an argument that was made before the board pointing to any reason that you would have a different number come out. And one kind of, I think, good way to show how carefully the board thought about this is that you'll see that they did not find that Kretz anticipated the thermostability limitations because Kretz was a different E. coli. It was an E. coli B phytase, and it was only a few amino acids different than E. coli ApA, but the board recognized that that's not enough for inherency. We need the same enzyme and the same phytase, and E. coli B is not the same phytase, and therefore, it's not anticipated. So the board did a very thorough job, consisting with this court's precedent, in finding support for the inherency merits. With respect to the priority issue, can you address your opponent's arguments regarding corroboration? Yes, Your Honor. We believe that the board's finding of no corroboration for Dr. Lee's testimony that he conceived of using non-yeast fungal hosts is supported by substantial evidence. The board poured into a number of supports for a decision, including the document's entire focus on yeast hosts, Dr. Lee's testimony that his documents were silent as to any non-yeast fungal hosts. Well, just to save a little time, their argument seems to be more of a legal argument than a substantial evidence argument, and they cite some cases in support of theirs. They talk about the rule of reason, so why don't you address, focus on that a little? Certainly. So the rule of reason, importantly, does not dispense with the requirement for corroboration. And here, corroboration is judged by substantial evidence. So I'd say, while it sounds like it's something different, because the rule of reason does not dispense with corroboration, and whether or not there's substantial corroboration, which, as the board found, there is not, that is judged by substantial evidence. And here, the substantial evidence overwhelmingly supports the board's finding of no corroboration. The expert testimony that Cornell points out is what Dr. Robertson and Dr. Benedict thought, well later on in this timeline of this case, what they would have thought. That does not support that Dr. Lay himself thought that or disclosed it to others, which is what the corroboration requires. And Ms. Goldenberg also made the point that the crucial thing is to compare what Lay thought with the pretty slight commentary, let's call it, of Kretz in referring to the broader group of fungi. Yes. So they are correct that you need to only show prior invention of what the reference shows. However, as the board found, the reference shows more. They say fungal hosts as a broad category. Use them. That's important. Use fungal hosts. And then yeast. The reference here being Kretz. Correct, correct. And then yeast as a non-limiting category there. Dr. Lay, on the other hand, said just use yeast. He didn't say use broader fungal hosts. And Kretz did say use yeast. One of the ways we know that is that Cornell has not disputed Kretz's anticipation of disclosing filamental fungus hosts. So the board found that Kretz anticipates the disclosure of or the claims that are directed to filamentous fungal hosts. And that's Appendix 53. And that's not disputed by Cornell. So Cornell is broader. They're saying use fungal hosts and, in fact, use filamental fungal hosts at minimum, which is broader than what Dr. Lay said, which is just use yeast. Focus on yeast, non-yeast fungal hosts. Done it in these two. There's no documents talking about anything else. Dr. Lay's testimony said the documents are silent. And so any attempt to kind of change what the document says in this particular manuscript later on just doesn't match up, as the board found, with what Dr. Lay actually said. And so I see that I'm out of time. Unless your honors have any other questions, we ask that you reject Cornell's attempt to reweigh the evidence both for obviousness and antedating. Seeing no questions, thank you. Thank you. We went a little over, so Ms. Goldenberg will restore you to your rebuttal. Thank you, Your Honor. Three main brief points to make on rebuttal. The first is there's no record evidence of how many industrial hosts were available at that time to choose from. Chang discusses a couple, but there's no record that those were the only ones. And once again, it was their burden to prove obviousness. And without a record to show, and there's agreement that there were millions of possible combinations and many possible hosts in general. So the director's attempt to sort of limit that to just the few that are in Chang is classic hindsight bias. The second issue is that regards Olson. And I heard the argument again on waiver. We believe that the Olson findings were based on inherency only, but to the extent the court does want to review our opening brief, we did address Olson separately on page 31, where we reference it, that the board actually miscites Olson. And if you go to appendix page 63, you'll see the quote where the board says that Olson discloses that a bacterial cellulose synthesized in yeast was found to be heavily glycosylated and that the thermostability was improved relative to the native form. The board ends the citation there. Olson goes on to say, but the increase was moderate. Olson does not disclose the thermostability claims. And you can also look at Olson on appendix page 10740. Opposing counsel mentioned that Dr. Lee said just use yeast. I heard that during argument. He never said that. If you look at his manuscript, he clearly references why the fungal hosts that he chose are successful and why he doesn't think that the invention is limited to yeast. And the testimony that they relied on in their brief, which is on appendix page 8729 at page 359, doesn't say that he never thought about using broader fungal hosts. It just says that his own experimental records don't show that he successfully expressed it in the broader fungal hosts. I guess one last point I want to make as well is that the analysis on motivation to combine for the 300 patent mentions cruts and relies heavily on cruts and the other combinations, which makes it much more difficult for this court to understand exactly why it found motivation to combine. There's a lot of citations back to the analysis in cruts and a lot of citations to cruts. So if cruts is indeed annotated, then at minimum, this court should consider reversing or vacating the findings as to the 300 patent and sending that back so that we can get clear findings on the motivation to combine. I know Judge Toronto asked me earlier about motivation to combine. Now, if you affirm across the board, my answer still stands, but if you affirm across the board on motivation to combine, you don't need to address the cruts reference, but you can also look specifically at the 300 patent and see how cruts infected the analysis, and then I wouldn't affirm across the board and would reverse on that. So I just wanted to clarify that. Thank you. Thank you. We thank both sides, and the case is submitted.